UNITED STATES v. NORTHWESTERN OHIO NATURAL GAS CO.

(Circuit Court, N. D. Ohio, W. D.    October 27, 1905.)

No. 1,848.

INTERNAL REVENUE—WAR REVENUE ACT—PIPE LINE COMPANIES.

The provisions of section 27 of the War Revenue Act of June 13, 1898, c. 448, Schedule B, 30 Stat. 464 [U. S. Comp. St. 1901, p. 2306], imposing on persons, firms, corporations, or companies "owning or controlling any pipe line for transporting oil or other products, whose gross annual receipts exceed two hundred and fifty thousand dollars," a special tax on the excess of receipts above such amount, apply only to receipts from the transportation business, and to persons or companies engaged in such business; and a company engaged in the business of producing and buying natural gas, which it conveys by means of pipes to a city, where it distributes and sells the same to consumers, is not engaged in the business of transportation, within the meaning of the act, nor subject to the tax on the excess of its annual receipts from its business above $250,000.

At Law.   Trial to the court by stipulation.

John J. Sullivan, U. S. Atty.

Doyle & Lewis and J. W. Schaufelberger, for defendant.

TAYLER, District Judge.   In the War Revenue Law of 1898 (Act June 13, 1898, c. 448, Schedule B, 30 Stat. 464 [U. S. Comp. St. 1901, p. 2306]) the following provision occurs in section 27:

"Sec. 27. That every person, firm, corporation, or company carrying on or doing the business of refining petroleum, or refining sugar, or owning or controlling any pipe line for transporting oil or other products, whose gross annual receipts exceed two hundred and fifty thousand dollars, shall be subject to pay annually a special excise tax equivalent to one-quarter of one per centum on the gross amount of all receipts of such persons, firms, corporations, and companies in their respective business in excess of said sum of two hundred and fifty thousand dollars."

The United States brought this action against the defendant, seeking, under this statute, to recover the amount of tax which it claimed was due from its operations during the years 1899 and 1900.   The defendant answered, denying liability, and the following stipulation, embodying an agreed statement of facts, was entered into by the parties:

"(1)   The defendant, the Northwestern Ohio Natural Gas Company, is now, and was at all times hereinafter mentioned, a corporation, organized, existing, and doing business under and by virtue of the laws of the state of Ohio, with its principal office at the city of Toledo, Lucas county, Ohio, and within said district.

"(2)   Said corporation, during all the times hereinafter mentioned, owned and controlled a pipe line for transporting natural gas, which pipe line and the method of transporting natural gas are hereinafter more particularly described.

"(3)   The gross annual receipts of said corporation from all sources for each of the years ending, respectively, June 30, 1899, and June 30, 1900, were more than two hundred and fifty thousand dollars ($250,000).

"(4)   During the said two years ending, respectively, June 30, 1899, and June 30, 1900, said corporation was engaged in the business of producing, buying, and selling to its consumers natural gas for fuel and lighting purposes.

"(5)  For the purpose of carrying on its said business, said corporation had purchased and leased large tracts of gas-producing territory in the counties of Wood and Hancock, state of Ohio, which territory was located from thirty to forty miles south of the said city of Toledo, and in which territory said corporation drilled its natural gas wells, and connected the same, respectively, by a system of small pipes known as 'lead pipes,' with a large main pipe line, constructed and owned by said corporation, leading from the village of Van Buren, in said Hancock county, through the respective villages of Bowling Green, Perrysburg, and Maumee, in said Wood county, to the said city of Toledo, a distance of about thirty-five miles.

"(6)  At the end of said main pipe line at the said city of Toledo, said corporation erected, and during the years aforesaid maintained, and still maintains, a reducing station, where the pressure of said natural gas, coming to said reducing station through said main pipe line, is reduced, and is thence conveyed, through a system of smaller distributing pipes, which reach throughout said city and to the various consumers of such natural gas, and on the premises of each consumer said corporation owns and maintains a gas meter for measuring the natural gas consumed. Said corporation's natural gas is thus carried from its said wells through said lead pipes to said main pipe, thence through said main pipe to said reducing station, and thence through said system of distributing pipes to the premises of its consumers, where it is metered and sold.

"(7)  Such reducing stations and distributing pipes and meters are also placed and maintained at the said villages of Perrysburg and Maumee. At the said village of Bowling Green, said corporation sells its natural gas to a local company, which distributes and sells the same to consumers in said village.

"(8)  Prior to the year 1898, owing to the low pressure of natural gas from said territory, said corporation was compelled to and did construct a pumping station at the head of said main pipe line at said village of Van Buren, from which its natural gas was forced through said main pipe line to its said reducing stations and its consumers.

"(9)  In the month of July, 1899, the supply of natural gas in said territory being nearly exhausted, said corporation extended its main pipe line from said village of Van Buren, southward about one hundred and twenty miles to the county of Fairfield, Ohio, and contracted with the Logan Gas & Fuel Company to purchase such natural gas as said corporation might need for its consumers. Said extension of said main pipe line was completed in the month of December, 1899. This defendant corporation then also constructed, and has since maintained, such pumping station at said Fairfield county, to force the natural gas so purchased through said main pipe to its said consumers in said villages and city; and since the completion of said extension of said main pipe, about ninety per cent. of the natural gas sold and delivered by said corporation to its consumers has been purchased from said Logan Company.

"(10)  Said corporation is not a transportation company, except as herein stated. It has never carried or transported, and does not now carry or transport, any oil, natural or other gas, or other thing or product for any other person, firm, company, or corporation, but transports exclusively its own natural gas so by it produced and purchased, as aforesaid, and so transported from the respective places of production and purchase, through its own pipes exclusively, direct to the premises of its consumers, as aforesaid, and there metered and sold to its consumers, as aforesaid.

"(11)  The value of transporting said corporation's natural gas from the respective places of production and purchase, as aforesaid, through said main pipe to the places of reduction and distribution, as aforesaid, during the said two years ending, respectively, June 30, 1899, and June 30, 1900, was less than fifteen per cent. of the gross receipts of said corporation during said years from the sale of its said natural gas; otherwise stated, said lead pipes and main pipe line contributed less than fifteen per cent. to the gross receipts of said corporation from its natural gas transported and sold.

"(12)  Some of the wells drilled by said corporation on its said territory yielded oil instead of natural gas, and other wells would in time cease yield-

ing natural gas in paying quantities, and become oil-yielding wells. Said corporation, having no facilities for handling the oil so produced by its wells, sold and delivered said oil at said wells to persons and corporations engaged in the oil business, and the income and royalties derived from the sale of said oil was carried into and constitutes a part of the gross receipts of said corporation during said two years.

"(13) The greater part of the surface of the territory so purchased for natural gas purposes is tillable, and said corporation leased the same to farm tenants for tillage, and the rents and income so derived was also carried into and constitutes a part of the gross receipts of said corporation during said two years.

"(14) During and prior to the said two years, said corporation invested its surplus earnings in United States government bonds, and the interest and income accruing and paid on said bonds was also carried into and constitutes a part of the gross receipts of said corporation for and during the said two years.

"(15) During said two years said corporation sold and disposed of junk and sundry machinery and materials of which it had no further use, and the sums derived from that source was also carried into and constitutes a part of the gross receipts of said corporation for said two years.

"(15) The gross receipts of said corporation from all of said sources for the year ending June 30, 1899, were as follows:

From sale of natural gas ...............................$269,552 43
From oil sold at wells, as aforesaid. ......................  25,071 71
Rents and income from lands, as aforesaid .............   2,095 01
Interest on United States bonds .......................  11,600 20
Sale of junk and sundry items .........................   1,288 03
                                                       _____
                                                       $309,607 38

"(16) The gross receipts of said corporation from all of said sources for the year ending June 30, 1900, were as follows:

From sale of natural gas .............................$285,074 77
From oil sold at wells, as aforesaid ....................  32,998 99
Rents and income from lands, as aforesaid .............   2,152 84
Interest on U. S. bonds ...............................   8,467 68
Sale of junk, &c., as aforesaid .......................   3,526 40
                                                       _____
                                                       $332,220 68

"(17) Said corporation had no income or receipts from any source except as above set forth.

"(18) Said corporation has refused, and still does refuse, to make any return of the amount of its gross receipts for and during said two years to the collector of the district in which said corporation is located and has its place of business.

"(19) The United States of America, plaintiff herein, has made demand upon said defendant corporation for the sum of four hundred and eighty dollars and forty-seven cents ($480.47), together with a penalty of five per cent. (5%) thereon, and interest thereon at the rate of one per cent. (1%) per month on the sum of one hundred and thirty-six dollars and thirty-nine cents ($136.39) and three hundred and forty-four dollars and eight cents ($344.08), and on said penalty from July 1, 1899, and July 1, 1900, respectively, but said defendant corporation has refused, and still does refuse, to pay the said sum, penalty, and interest, or any part thereof.

### "Stipulation.

"It is hereby stipulated and agreed that the above cause shall be submitted to the court, without the intervention of a jury, upon the pleadings and the foregoing agreed statement of facts."

The question before the court is whether the Northwestern Ohio Natural Gas Company was, during the years named, engaged in a business

which made it subject to the tax levied by section 27 of the act. I have no difficulty in coming to the conclusion that, on the statement made, the defendant is not liable. In the first place, I am clearly of the opinion that the defendant is not a company engaged in a kind of business which makes it subject to the statute; and, in the second place, even if it was, the tax could only be levied on so much of its income as is derived from the business of transporting gas and oil by means of a pipe line. It appears that the defendant is engaged, primarily, in the business of supplying natural gas to consumers in the city of Toledo. The price which it receives for the gas thus furnished is payment for the gas. Incidentally, it is necessary for the company to obtain a supply of gas by drilling wells in the neighboring country, and to transport that gas to the place of consumption. To thus transport the gas by means of pipes does not constitute the company a transporting company, nor is it thereby engaged in the business of transporting oil or gas by means of pipe lines. Such transportation is, in the most definite sense, merely incidental. It is not, in any respect, to be distinguished from the business of transporting gas in which a manufactured gas company is engaged; such company having a plant within the limits of a city, and conducting the gas which it thus manufactures through the streets of the city to the places where its customers consume it. I think it would be an absolute denial of justice to come to any other conclusion. The purpose of the law was not to reach any such case. It might as well be said that if the gas company produced $1,000,000 worth of gas at a well, and conveyed it 100 feet to a point where it was all consumed, it would, under this law, be taxed on the $750,000 excess which the value of the gas represented above the $250,000 named in the law.

We are not compelled to rely wholly upon the soundness of this position as a mere statement of general principles, for, so far as I am advised, the courts have never held, in any case, the contrary view. In the case of Carothers' Appeal, 118 Pa. 485, 12 Atl. 318, the court says, speaking of a natural gas company:

"The situation is precisely the same as in the case of illuminating gas, which is manufactured, stored, and conveyed by pipe lines to the places of consumption. The business is that of making and supplying gas for light, and transportation to the consumer is incidental. The same is also true of water companies. They produce, store, and supply to consumers water. Transportation by means of pipes is the means of delivery, and is a mere incident to the business."

So, also, the Supreme Court of the United States, in the case of Spreckels Sugar Refining Company v. McClain, 192 U. S. 397, 24 Sup. Ct. 376, 48 L. Ed. 496, says:

"We are of opinion that, upon the point last stated, there was error. The gross annual receipts, upon which, in excess of a certain amount, the tax was imposed, were, under the statute, only receipts in the business of refining sugar, not receipts from independent sources. But clearly neither interest paid to plaintiff on its deposits in bank, nor dividends received by it from investment in the stocks of other companies, were receipts in the business of refining sugar."

So that the most that could be said is that, under this section 27, the receipts upon which the tax could be levied would be such sum in ex-

cess of $250,000 per year which the company received for the business of transporting gas. In this case it is agreed that the reward for that part of the business of the defendant company does not exceed one-fifteenth of its total receipts; so that, in any event, there would be no right to recover.

Judgment, therefore, may be entered for the defendant.